**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CENTRAL DIVISION**

VIRGINIA SETTELL,

          Plaintiff,

vs.

METROPOLITAN LIFE INSURANCE
COMPANY,

          Defendant.

No. C 07-3007-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING ACTION FOR
JUDICIAL REVIEW OF ERISA
BENEFITS DETERMINATION**

———————

**TABLE OF CONTENTS**

*I.* **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
   *A.* *Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
      *1.* *The parties* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
      *2.* *Chronological overview* . . . . . . . . . . . . . . . . . . . . . . . 5
      *3.* *Plan terms* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
      *4.* *Medical determinations* . . . . . . . . . . . . . . . . . . . . . . . 9
      *5.* *MetLife's final denial of LTD benefits* . . . . . . . . . . . . . . 15
      *6.* *Settell's requests for plan documents* . . . . . . . . . . . . . . 17
   *B.* *Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*II.* **LEGAL ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
   *A.* *Denial Of Benefits* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
      *1.* *Authority for a civil action* . . . . . . . . . . . . . . . . . . . 20
      *2.* *Standard of review* . . . . . . . . . . . . . . . . . . . . . . . . 21
      *3.* *Arguments of the parties* . . . . . . . . . . . . . . . . . . . . . 22
      *4.* *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
   *B.* *Failure To Provide Plan Documents* . . . . . . . . . . . . . . . . . . . . 28
      *1.* *Authority for a penalty* . . . . . . . . . . . . . . . . . . . . . . 28
      *2.* *Arguments of the parties* . . . . . . . . . . . . . . . . . . . . . 30
      *3.* *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*III.* **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

This action involves the plaintiff's request for judicial review of the denial of her application for long-term disability (LTD) benefits pursuant to a benefits plan from her employer governed by the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 *et seq.* The plaintiff asserts that the defendant insurer and administrator for the LTD benefits portion of the ERISA plan disregarded the opinions of her numerous treating physicians and the restrictions recognized by the insurer's own consulting physicians to conclude that she was not disabled within the meaning of the LTD plan. She also contends that the insurer should be subjected to the maximum penalty under ERISA for failing to produce plan documents in response to her numerous requests. The insurer, however, contends that its decision to deny LTD benefits is supported by substantial evidence, so that it did not abuse its discretion in denying such benefits. The insurer also argues that it cannot be subjected to any civil penalty for failing to provide plan documents, because it was only the claim administrator for the LTD part of the plan, not the plan administrator, which was the plaintiff's employer, and that it repeatedly referred the plaintiff to the employer for copies of the plan documents. The matter was submitted on a written record and briefs.[1]

---

[1]Indeed, this matter was fully submitted on January 7, 2008, more than a year-and-a-half ago. Even with this court's crowded docket, parties should not have to wait more than a year-and-a-half for resolution of a pending matter in the absence of any case-specific grounds for delay. The court regrets and apologizes for the undue delay in reaching this case.

## I. INTRODUCTION

### A. Factual Background

In light of the claims and issues in this case, the court finds that a brief identification of the parties and a chronological overview of key incidents will be helpful to understand the context of the case. However, the court believes that, thereafter, a more coherent picture of specific matters at issue here can be obtained from a "topical" discussion of the background of the case.

#### 1. The parties

Plaintiff Virginia Settell was a long-time employee of Fort Dodge Animal Health (FDAH) in Fort Dodge, Iowa. FDAH, a subsidiary of American Home Products Corporation and Wyeth, manufactures and distributes prescription and over-the-counter animal health care products. Settell worked as a processing engineer, a position that involved cleaning and maintaining the large vessels in which various animal medications were produced. Settell alleges that she suffers from a number of health conditions that impacted her ability to perform her job at FDAH, including chronic sinusitis, allergic rhinitis, reactive airway disease, osteoarthritis in her knees, degenerative disc disease in her back and neck, fibromyalgia/chronic pain syndrome, depression, and anxiety. She contends that these conditions eventually forced her from her employment with FDAH.

At the times pertinent here, American Home Products Corporation—which is not a party to this litigation—had an Employees' Group Insurance Program, which the parties agree was available to FDAH employees and which they also agree was governed by ERISA (the ERISA Plan). Administrative Record, 198-239 (Summary Plan Description or SPD). The ERISA Plan included the following plans: a comprehensive medical plan; a prescription drug plan, a dental plan; a "Weekly Sickness and Accident Plan" (a short-term disability or STD plan); a "Voluntary Long Term Disability Plan" (LTD plan); a

basic life insurance plan; a voluntary life insurance plan; a voluntary dependent life insurance plan; a voluntary accidental death and dismemberment plan; and a business travel accident plan. Administrative Record at 201-02. The ERISA Plan identifies the "Plan Administrator" as the Retirement Committee of American Home Products Corporation, Administrative Record at 238, but states that requests for claim reviews for claims pursuant to various plans, including the STD and LTD plans, should be sent through an employee's human resources department or benefits administrator to MetLife, American Home Products Unit. Administrative Record at 234 (identifying MetLife as the recipient for "all other claims," that is, claims other than comprehensive medical plan claims, prescription drug plan claims, and business travel accident claims, for which claim reviews were directed to other entities).

The defendant in this action is Metropolitan Life Insurance Company (MetLife), an insurance company incorporated in New York and authorized to do business in Iowa. Settell alleges that MetLife was the insurer and either the plan administrator or the claim administrator for her LTD claim under the ERISA Plan. MetLife argues that it was, if anything, only the claim administrator and insurer for the LTD plan in the ERISA Plan for American Home Products.[2]

---

[2]On December 26, 2007, the day MetLife's brief on the merits was due, MetLife filed an eleventh hour motion to amend its answer to allege that it was actually only the insurer and claim administrator for something called a "Total Permanent Disability Plan" in the ERISA Plan for American Home Products and that, at the pertinent time, the LTD plan in the ERISA Plan was insured and administered by UNUMProvident. Such contentions also appear in MetLife's "Trial Brief" (docket no. 22) filed December 26, 2007. However, by Order (docket no. 25) dated January 9, 2008, a magistrate judge of this court quite rightly denied MetLife's motion to amend its Answer on the grounds that MetLife offered no adequate justification or rationale for so belated an amendment and that

(continued...)

## 2.    *Chronological overview*

Settell worked for FDAH from May 21, 1979, to July 10, 2001.  At the times pertinent here, Settell was employed as a processing engineer.  As mentioned above, the primary tasks of a processing engineer are to clean and maintain the large vessels in which various animal medications are produced.  The Administrative Record reveals the following duties for Settell's position:

> Must be able to perform duties which are critical to the operation of Bioreactors, Cell Cubes, Bacterin and Blending areas.
>
> Typical, but not limiting, duties may include:
> 1.    Disassembly, cleaning, testing, assembly of equipment systems and components
> 2.    Perform routine preventive maintenance procedures
> 3.    Removal of decon waste fluids
> 4.    Complete equipment release documentation
> 5.    Sterilization of decon systems
> 6.    Specialty bottle gasses monitoring and changing
> 7.    Assist higher rated employees

---

[2](...continued)
the belated amendment changed significantly the issues before the court, contrary to admissions in the original answer, under which the parties had been formulating their litigation strategies.  The court also notes that there is absolutely nothing in the SPD for the ERISA Plan, Administrative Record at 198-239, that identifies a "Total Permanent Disability Plan" as part of the ERISA Plan or that identifies any entity other than MetLife as the insurer and claim administrator of the LTD plan under the ERISA Plan.  MetLife's attempt to supplement the record with matters outside of the Administrative Record before it at the time of the denial of benefits is also improper.  *See, e.g., Willcox v. Liberty Life Assur. Co. of Boston*, 552 F.3d 693, 698 (8th Cir. 2009) ("[T]he general rule is that 'review under the deferential standard is limited to evidence that was before' the administrator."  (Quoting *Cash v. Wal-Mart Group Health Plan*, 107 F.3d 637, 641 (8th Cir. 1997), with internal quotation marks omitted)).

> Must have the ability to perform interior and exterior vessel cleaning, perform heavy lifting, and must have good eyesight (corrected).
>
> Job requirements may change to exclude some of the elements listed above, or additional elements requiring a similar level of skill may be included.

Administrative Record at 281. An "Employer's Statement" submitted to MetLife in relation to Settell's claim included the following statement of "Current Occupational Requirements" for Settell's position: Exposure to soap/alcohol/bleach 20% of the working day; exposure to temperature extremes 5% of the working day; exposure to enclosed spaces 1% of the working day; sitting 18% of the working day; standing 45% of the working day; walking 25% of the working day; climbing stairs/ladders/scaffolds 1% of the working day; cramped/unusual positions 1% of the working day; extended reach forward/overhead 1% of the working day; pushing/pulling/twisting 5% of the working day; grasping/handling 5% of the working day; bending/stooping/squatting 2% of the working day; fine hand dexterity 1% of the working day; highly repetitive motion 5% of the working day; carrying and lifting 0 to 15 pounds 20%-60% of the working day (with a handwritten notation indicating "less than 5 lbs."); and carrying and lifting 16 to 30 pounds less than 20% of the day (with a handwritten notation indicating "seldom").[3] Administrative Record at 277-79.

Settell's various health conditions caused her to miss significant numbers of days of work with increasing frequency in 1999, 2000, and 2001, to the point where the human

___

[3]"Exposures," "activities," and "carrying and lifting" identified as "0%" of the working day or "never" are excluded. All percentages for "exposures" and "activities" are explained as "per day average for a month"; "carrying and lifting" requirements are explained as "periodic." Administrative Record at 277-79.

resources director for FDAH notified Settell's treating physician, Dr. Robert T. Brown on March 29, 2001, that "Ms. Settell has developed an absence pattern that is viewed as excessive," and requested Dr. Brown's assistance with determining whether reasonable accommodations were possible. Administrative Record at 94. During the spring of 2001, Dr. Brown suggested changing Settell's work environment and, eventually, took her off work for a month to see if her condition would improve away from the work environment. Whenever Settell returned to work, her condition worsened. Eventually, after attempts by FDAH to accommodate Settell's condition, Dr. Brown took Settell off work until she completed testing and treatment with the physicians at the University of Iowa Hospitals and Clinics. Settell last worked at FDAH on July 10, 2001.

Although Settell initially received some STD benefits, MetLife discontinued those benefits during the late summer and fall of 2001. It was not until late 2003 that MetLife determined that Settell was entitled to the full period of STD benefits and paid those benefits, apparently based on the conclusions of Dr. Robert A. Menotti, a physician asked by MetLife to review Settell's medical condition. Specifically, by letter dated October 23, 2003, Settell was advised by MetLife that her "claim for disability benefits has been extended through December 16, 2001," the "maximum time allowed under the plan." Administrative Record at 59.

Settell then sought LTD benefits from the end of the six-month period of STD benefits, but her claims and appeals over the next few years were all denied.

### 3.    *Plan terms*

The ERISA Plan includes a "Weekly Sickness and Accident Plan" or STD plan. The STD plan paid a certain percentage of an employee's weekly earnings, up to a weekly benefit cap, for up to 26 weeks, "when you are totally disabled and not able to work because of a sickness (including pregnancy) or accident not covered by Workers'

Compensation or Occupational Disease Laws or by any state or provincial law."
Administrative Record 217. The SPD for the ERISA Plan does not define "totally
disabled" in the description of the STD plan. The parties agree, however, that the
pertinent definition for the STD plan is found in the description of the LTD plan:

**Total Disability**

During the waiting period (six months) and the first 24 months
that LTD benefits are payable, "total disability" means the
complete inability to perform the duties of your occupation.

After this 30-month period, "total disability" means the
inability to engage in any substantial gainful employment for
which you are reasonably fitted by education, training or
experience.

You will not be considered totally disabled during any period
in which you are gainfully employed in any occupation except
for approved rehabilitative employment.

Medical proof of total disability is required before benefits
become payable and will be required periodically during the
continuance of your disability.

Administrative Record at 218. The LTD plan paid a certain percentage of an employee's
monthly earnings, up to a monthly benefit cap, starting after the "waiting period" (covered
by STD benefits), "during extended disability." Although the SPD does not explicitly so
state, the parties apparently agree that LTD benefits are contingent on "total disability"
using the definition quoted above. Administrative Record at 218. Thus, the description
of "total disability" for the ERISA Plan is two-tiered: The definition for the six-month
period covered by the STD plan and the first 24 months of the LTD plan is in relation to
the claimant's ability to perform the duties of his or her own occupation; the definition

after this 30-month period (*i.e.*, for further LTD benefits) is in relation to the claimant's ability to perform "any substantial gainful employment" for which the claimant is reasonably suited.

### 4. *Medical determinations*

Settell argues that all of her treating physicians agree that she is "disabled." More specifically, Dr. Brown initially recommended that Settell stay off work at FDAH until she had completed her treatment and testing at the University of Iowa Hospitals and Clinics (UIHC) in the summer of 2001. Settell returned to see Dr. Brown in August 2001, but he still did not have the records from UIHC, so he did not change his recommendation that Settell stay off work temporarily. On September 25, 2001, Dr. Brown issued Settell a doctor's note stating that she was "advised to remain off work until [he] exam[ined] her next on October 8, 2001." Administrative Record at 313.

The physicians in the Allergy-Immunology Department at UIHC provided two diagnoses for Settell after three visits between June 21, 2001, and July 28, 2001: (1) "Chronic rhinitis with a vasomotor component"; and (2) "Asthma symptoms with history of occupational exacerbation." Administrative Record at 356. They did not, however, offer any disability determination, although they did "encourage [Settell] to wear a mask while at work with any exposure," and to bring Material Safety Data Sheets for any chemicals or products to which she was exposed at work to her next visit to the occupational medicine unit. Administrative Record at 356.

After Dr. Brown had received the report from the UIHC, his records indicate that, by October 8, 2001, Settell was "much improved away from workplace," but he nevertheless "[r]ecommended to patient that in light of Iowa City's evaluation and recommendation that she refrain from returning to work due to health concerns" and "[s]uggested she seek alternative employment." Administrative Record at 316. He also

"filled out papers for disability and recommended that she remain off work indefinitely." Administrative Record at 316. Dr. Brown's companion "Certificate Of Physician's Visit" for FDAH indicated that, from July 9, 2001, to October 8, 2001, Settell had been under his care for "reactive airway disease" and listed her "restrictions and duration" as "permanent disability." Administrative Record at 314. On December 20, 2002, Dr. Brown also authored a letter on Settell's behalf, addressed "to whom it may concern," stating, in pertinent part, the following:

> Ms. Settell has been a patient of mine for her chronic sinus problems as well as her allergies and reactive airway. This patient has been evaluated extensively, by here and at the University of Iowa. The patient was felt to have asthma with an occupational component as well as chronic sinusitis and reactive airway disease.
>
> Due to the aggravation of her symptoms in her work environment, she has been unable to work and many of her life activities have been altered due to her restricted breathing. Because of these various symptoms, the patient has been unable to work.

Administrative Record at 76.

In the course of her attempts to secure STD and LTD benefits from the end of her STD benefits, Settell submitted to MetLife at various times the opinions of four medical providers besides Dr. Brown, all also indicating that she was "disabled" owing to various health conditions, not just owing to her breathing problems. More specifically, John D. Calisesi, a licensed chiropractor in Fort Dodge, Iowa, opined in December 2001, in a letter to the Disability Determination Services Bureau, in pertinent part,

> [Settell] should refrain from excessive bending, stooping and no lifting over 15-20 pounds. Kneeling and crawling would be prohibited and detrimental.

> It is my opinion that this patient is physically impaired in
> regards to her degenerative joint disease and certainly should
> be afforded disability benefits.

Administrative Record at 73-74.  In a letter to Settell dated December 17, 2002,

Dr. Michael J. Finan, of the Mercy Clinics Arthritis and Osteoporosis Center in Des

Moines, Iowa, declined to opine as to whether Settell was disabled owing to various

respiratory complaints, but did opine that she had "fibromyalgia as well as significant

osteoarthritis of the knees," and that "the osteoarthritis of your knees precludes you from

being employed in any type of position that requires standing longer than 30 minutes

without resting or walking more than 100 yards without rest."  Administrative Record at

75.[4]  In a letter dated February 3, 2003, regarding Settell, addressed "to whom it may

concern," Dr. Steven Wanzek of the Pulmonary Division of the MacFarland Clinic in

Ames, Iowa, stated the following:

> [Settell] is a patient followed in the Pulmonary Division of the
> MacFarland Clinic with a history of obstructive airways
> disease requiring maintenance controller medication with a
> long-acting beta agonist and inhaled corticosteroid and a
> leukotriene modifier.  She is still having symptoms with a
> variety of exposures including cigarette smoke, diesel fuel, car
> fumes, soaps, detergents, cleaners, and alcohol.  She has also
> had a history of chronic sinus complaints similarly aggravated.
>
> It is clear that the variety of triggers for her symptoms despite
> substantial maintenance medication is consistent with the
> disability that substantially affects her life activities including

---

[4]Another letter from Dr. Finan to the Disability Determination Services Bureau quoted in a letter from Settell's counsel to MetLife found in the Administrative Record at 267, but apparently not itself elsewhere in the record, adds that Settell cannot carry more than 10 pounds on an occasional basis.

> her ability to work including exposures that would be expected
> to occur with her job at the Fort Dodge labs. . . .

Administrative Record at 77. Finally, Dr. Alan Nguyen's office notes from April 16, 2004, state that Settell is "disabled due to multiple medical problems." Administrative Record at 360.[5]

As indicated above, MetLife eventually awarded Settell STD benefits, shortly after Dr. Robert A. Menotti reviewed her file and provided a Physician Consultant Review dated October 1, 2003. The body of Dr. Menotti's Physician Consultant Review, in its entirety, states the following:

> I have been asked to review the file of Virginia Settell who is a 54-year-old Process Engineer employed by Wyeth. Based on the new medical information available to me, the situation appears to be as follows:
>
> This 54-year-old Process Engineer has a diagnosis of allergic rhinitis. She has been followed in this regard over a long period of time by Dr. Robert T. Brown. Dr. Brown was suspicious of a work environmental problem that was causing her allergic rhinitis and suspected that her airway disease and sinusitis may have been triggered by solvents or other aeromatic [sic] substances that she was coming in contact [with] through the workplace. He referred her to Iowa City where she was seen at University Hospital in the occupational department on 09/21/01. Although the actual referral from the Iowa City Hospital is not appended to the current file, there is some inference to this from the pulmonary division of the MacFarland Clinic in a letter by Dr. Steven Wanzek dated 02/03/03. Dr. Wanzek identifies her environmental triggers

---

[5]Settell received a Notice of Award from the Social Security Administration dated April 5, 2002, notifying her that she "became disabled under our rules on July 10, 2001." Administrative Record at 128.

as cigarette smoke, diesel fuel, car fumes, alcohol, soaps, detergents, and cleaners. *It would appear to this reviewer that she clearly has an occupational health issue with her current work site and would therefore be considered medically unable to perform the essential duties of her own occupation at that workplace from the time period in question of 06/22/01 through to the current date.* It is interesting to note that the claimant attempted to return to work in a somewhat restricted environment several times and got down to the point of even considering severe accommodations such as a total environmental suit. However, Dr. Brown was able to document on November 21, 2001, that since the claimant had been out of the workplace for a sufficient period of time that she had marked improvement in her symptoms and mental status and felt that this proved that the respiratory component of her illness had a direct correlation with her workplace environment. I believe the subsequent evidence provided in this medical file confirmed that impression. *Based on the foregoing, I believe the medical evidence is clear and supports the notion that the claimant would be medically unable at this point in time to perform the essential duties of her own occupation as a result of her environmental exposures at the workplace.*

Administrative Record at 61-62 (emphasis added).

In contrast, Dr. Robert C. Porter, who is board certified in Occupational Medicine, completed a Physician Consultant Review at MetLife's request concerning Settell's LTD claim on January 6, 2005. Administrative Record at 194.[6] The pertinent part of his report is his answers to a series of questions:

---

[6] The parties agree that this report is misdated January 6, 2006.

QUESTIONS:

Does the medical information on file supports [sic] the functional limitations and the claimant's inability to function at any gainful occupation?

No. The information does not support a severity of reactive airway disease or allergic rhinitis to cause significant functional limitations and the claimant['s] inability to work on a full-time basis. Other diagnoses also have not remove[d] the option and ability to perform full-time work.

Why the medical information does not support functional limitations.

The physical examinations of the chest have generally been normal with [sic] is [sic] not support the severity of reactive airway disease to remove the ability to work on a full-time basis. Due to her osteoarthritis and fibromyalgia she may be limited to like [sic] work duties with looking [sic] up to 20 pounds maximum.

What information/documentation is lacking to support the claimant['s] inability to function and/or work.

There is no information it [sic] is lacking. The information in the records indicates normal chest examinations, normal spirometry and pulmonary function tests. The information does not support significant functional limitations to prohibit light work duties.

Does the medical information submitted in this file support any restrictions and/or limitations beyond July 9, 2001 to the present?

Information supports limitations to light work with looking [sic] to 20 pounds maximum than [sic] 10 pounds and [sic]

> repeated basis.  There is no limitation on sitting but standing
> and walking should be limited to one hour at a time and four
> hours per work day.  It may be prudent to avoid respiratory
> irritants but there is no strong association provided to work
> environments.  She has unlimited use of her upper extremities.

Administrative Record at 196.  Although Dr. Porter was asked to opine on Settell's ability to "function at any gainful occupation," which relates to the definition of "total disability" applicable to LTD benefits after the first thirty months, he apparently was not specifically asked to opine on Settell's ability to perform the duties of her occupation, which relates to the definition of "total disability" applicable to the six-month waiting period (covered by STD benefits) and the first 24 months of LTD benefits.

### 5.    *MetLife's final denial of LTD benefits*

By letter dated January 7, 2005, the day after Dr. Porter provided his Physician Consultant Review, MetLife notified Settell's attorney that it had completed review of the denial of Settell's claim for "total and permanent disability benefits" and was upholding the denial.  Administrative Record at 55.  The letter begins with a quotation of a definition of "total disability" that is similar but not identical to the definition in the SPD for the ERISA Plan, quoted above, at page 8.[7]  The summary of MetLife's decision appears in

---

[7]The letter states the definition as follows:
> During the waiting period and the first 24 months that
> LTD benefits are payable, "total disability" means that [sic]
> complete inability to perform the duties of your occupation.
> After this 30-month period, "total disability" means the
> inability to engage I [sic] any substantial gainful employment
> for which you are reasonably fitted by education, training, and
> experience.  Medical proof of total disability is required before
> benefits become payable and will be required periodically
> during the continuance of your disability.

(continued…)

the fourth paragraph of the letter:

> We have reviewed Ms. Settell's complete claim including a review by an Independent Physician Consultant. Based on the information in the file, we have determined that the medical documentation in Ms. Settell's file *does not support her inability to perform her own occupation or any gainful employment for which she is suited*.

Administrative Record 55 (emphasis added). The court finds that the two paragraphs of the letter explaining this conclusion are the following:

> To obtain a clearer understanding of Ms. Settell's condition the file was reviewed by an Independent Physician Consultant who is Board Certified in Occupational Medicine, Assistant Professor, University of Illinois College of Medicine, Fellow, American Academy of Disability Evaluating Physicians and Diplomate, American Board of Medical Consultants. The consultant determined that the information on file did not support functional limitations that *would have prevented Ms. Settell from functioning*. The information did not support a severity of reactive airway disease or allergic rhinitis *to cause significant functional limitations and the inability to work on a full time basis*. Examination of the ears, nose, throat and chest were similar and essentially normal while working and not working. The consistent lack of findings of wheezing and bronchospasm on examination did not support a severity of reactive airway disease. The information on record indicated normal chest examinations, normal spirometry and pulmonary function tests. Information related to Ms. Settell's osteoarthris [sic] and fibromyalgia support only minor limitations with lower extremities and [she(?)] *should be able to perform a*

[7](...continued)
Administrative Record 55. The letter then adds language that the court has not found in the SPD, which states, "The disability must be continuous and expected to remain permanent." Administrative Record 55.

16

*sedentary to light duty job*.   In reference to Ms. Settell's depression, there appeared to be a work situation, which was noted to be better.   It is difficult to know if the level of distress Ms. Settell was having was expected based on the difficulty she was having at work.   There were no objective test results submitted *to indicate a psychiatric global impairment of functioning*.   The file lacked clinical findings to support a severe impairment *preventing Ms. Settell from performing any job for which she was fit by your [sic] education, training and experience*.

In completing our appeal review, we have determined that there was insufficient medical documentation in the file to support any impairment that *would have prevented Ms. Settell from performing gainful work*.   The information did not support a severity of reactive airway disease or allergic rhinitis *to cause significant functional limitations and inability to work on a full time basis*.   Other diagnoses also have not removed the *option and ability to perform full time work*.   Medical documentation lacked evidence of a severe impairment that *would have prevented Ms. Settell from performing any work*. Therefore, we find our original decision to deny benefits was is [sic] appropriate.

Administrative Record at 56 (emphasis added).

### 6.   *Settell's requests for plan documents*

In a letter dated November 15, 2001, to a Case Management Specialist, Settell's then attorney requested "documentation to support your denial or refusal to pay benefits," but did not specifically request plan documents or the SPD for the ERISA Plan. Administrative Record at 149.   MetLife did not provide plan documents in response to this letter.

In a letter dated April 4, 2003, to MetLife's Case Management Specialist assigned to Settell's claim, Settell's attorney asked for, among other things, "[a] copy of the

applicable long term disability policy" and "[a] copy of the Summary Plan Description." Administrative Record at 72. Settell contends that MetLife simply did not respond to the request for these documents, and MetLife has not indicated where in the record there is a letter or other evidence indicating that the requested documents were sent to Settell's attorney. Instead, in a letter dated August 8, 2003, a Case Management Specialist for MetLife informed Settell's attorney that "[a] copy of Wyeth's Summary Plan Description and the applicable long term disability policy may be obtained from Wyeth's corporate office" at a stated address. Administrative Record at 65.

On July 22, 2004, Settell's attorney sent another letter to a MetLife Case Management Specialist again requesting, among other things, "[a] copy of the applicable disability Plan" and "[a] copy of the Summary Plan Description." Administrative Record at 260. By letter dated September 24, 2004, a Claim Examiner for MetLife responded, "Please be advised that for a copy of the applicable disability plan and the Summary Plan Description you will need to contact Ms. Settell's employer." Administrative Record at 265.

Although MetLife suggests in its briefing that its responses to Settell's requests for plan documents indicated that the documents were available from her employer, because the employer was the plan administrator, the court finds no identification of Settell's employer as "the plan administrator" in MetLife's responses to Settell's requests for documents directing Settell to her employer. The record does not indicate whether Settell ever requested plan documents from her employer, pursuant to MetLife's suggestion, or if she did request such documents from her employer, whether she ever received them. The SPD was eventually provided to Settell in this litigation in September 2007 as part of the Administrative Record. *See* Administrative Record at 198-239.

## B.  Procedural Background

On January 26, 2007, more than two years after MetLife's final denial of her claim for LTD benefits, Settell filed her Complaint (docket no. 2) in this action pursuant to 29 U.S.C. § 1132(a)(1)(B) against MetLife to recover benefits due under the terms of a disability plan.  She prayed for judgment in her favor "in an amount commensurate with the disability benefits that she has been denied," for the imposition of a civil penalty pursuant to 29 U.S.C. § 1132(c) based upon MetLife's failure to timely produce plan documents and other information necessary to prepare an adequate appeal, and for attorney fees and costs of the action.  MetLife eventually filed an Answer (docket no. 4) on April 27, 2004, denying that Settell is entitled to any relief and asserting, as affirmative defenses, that her Complaint fails to state claims upon which relief can be granted; that MetLife's determinations regarding Settell's claims for STD or LTD benefits were based upon substantial evidence in the claim file, in accordance with the terms of the Plan, and in the interest of Plan participants; and that Settell failed to satisfy the conditions precedent for payment of benefits under the Plan, in that she did not establish that she was totally disabled under the terms of the Plan.

On July 2, 2007, a magistrate judge of this court entered a Scheduling Order For A Claim-Review Case Filed Under ERISA (docket no. 9), setting a deadline of September 28, 2007, for the filing of the Administrative Record; a deadline of October 26, 2007, for the filing of Settell's opening brief; a deadline of November 15, 2007, for the filing of MetLife's brief; and a deadline of November 30, 2007, for the filing of Settell's reply brief.  On September 28, 2007, MetLife provided the court and Settell with what was purported to be the Administrative Record, but what was later discovered to be only the first volume of that record.  MetLife filed the second volume of the Administrative Record on November 30, 2007, as a Supplement (docket no. 19).  Briefing deadlines were

continued various times, but Settell filed her opening brief (docket no. 20) on December 3, 2007; MetLife filed its brief (docket no. 22) on December 26, 2007; and Settell filed her reply (docket no. 23) on January 7, 2008. As indicated above, by Order (docket no. 25) dated January 9, 2008, a magistrate judge of this court denied MetLife's December 26, 2007, Motion For Leave To Amend Its Answer (docket no. 21).

There, unfortunately, the matter languished until the present.

## II. LEGAL ANALYSIS

### A. Denial Of Benefits

Settell's first claim, pursuant to 29 U.S.C. § 1132(a)(1)(B), is that MetLife disregarded the opinions of her numerous treating physicians and the restrictions recognized by MetLife's own consulting physicians to conclude that she was not disabled within the meaning of the LTD plan. MetLife contends that substantial evidence supports its denial of benefits.

### 1. Authority for a civil action

The provision of ERISA under which Settell has brought her claim for denial of benefits provides as follows:

(a) Persons empowered to bring a civil action

A civil action may be brought—

(1) by a participant or beneficiary—

* * *

(B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.

20

29 U.S.C. § 1132(a)(1)(B). As the Supreme Court reiterated, in a decision handed down after briefing was completed in this case, this section of ERISA "permits a person denied benefits under an employee benefit plan to challenge that denial in federal court." *Metropolitan Life Ins. Co. v. Glenn*, ___U.S. ___, 128 S. Ct. 2343, 2346 (2008).

### 2.    *Standard of review*

As the Supreme Court also reiterated in *Glenn*, where, as here, the ERISA Plan grants the administrator or fiduciary discretionary authority to determine eligibility for benefits, "'trust principles made a *deferential standard* of review appropriate.'" *Id.* at 2348 (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111 (1989), with emphasis added by the Court). The Supreme Court also reiterated that "[i]f 'a benefit plan gives discretion to an administrator or fiduciary who *is operating under a conflict of interest*, that conflict must be *weighed as a "factor* in determining whether there is an abuse of discretion,"'" *id.* (again quoting *Firestone*, 489 U.S. at 115, with emphasis added by the Court) (internal citations omitted), but Settell does not argue here that any conflict of interest must be considered in determining whether there has been an abuse of discretion in MetLife's denial of her claim for LTD benefits.[8]

Thus, the applicable standard of review here is the following:

> Under the abuse of discretion standard applicable in this case, we will "reverse the plan administrator's decision 'only if it is

---

[8]The Eighth Circuit Court of Appeals has recognized that "[t]here is no doubt that *Glenn* changed ERISA review in some ways," *Chronister v. Unum Life Ins. Co. of Am.*, 563 F.3d 773, 775 (8th Cir. 2009), but none of those changes appear to be applicable here. *Id.* (the abuse-of-discretion standard as articulated in *Glenn* differs from the manner in which the Eighth Circuit Court of Appeals has applied that standard in that the Supreme Court's standard eliminates the causal connection requirement between the conflict of interest and the discretionary decision).

> arbitrary and capricious.'" *Groves v. Metro. Life Ins. Co.,*
> 438 F.3d 872, 874 (8th Cir. 2006) (quoting *Hebert v. SBC
> Pension Benefit Plan,* 354 F.3d 796, 799 (8th Cir. 2004)). To
> determine whether a plan administrator's decision was
> arbitrary and capricious, "we ask whether the decision to
> deny . . . benefits was supported by substantial evidence,
> meaning more than a scintilla but less than a preponderance."
> *Schatz v. Mut. of Omaha Ins. Co.,* 220 F.3d 944, 949 (8th
> Cir. 2000). "Provided the decision 'is supported by a
> reasonable explanation, it should not be disturbed, even though
> a different reasonable interpretation could have been made.'"
> *Id.* (quoting *Cash v. Wal-Mart Group Health Plan,* 107 F.3d
> 637, 641 (8th Cir. 1997)). "The requirement that the [plan
> administrator's] decision be reasonable should be read to mean
> that a decision is reasonable if a reasonable person *could* have
> reached a similar decision, given the evidence before him, not
> that a reasonable person *would* have reached that decision."
> *Jackson v. Metro. Life Ins. Co.,* 303 F.3d 884, 887 (8th Cir.
> 2002) (internal quotation marks omitted).

*Midgett v. Washington Group Int'l Long Term Disability Plan*, 561 F.3d 887, 896-97 (8th

Cir. 2009). "[T]he general rule is that 'review under the deferential standard is limited

to evidence that was before' the administrator." *Willcox v. Liberty Life Assur. Co. of

Boston*, 552 F.3d 693, 698 (8th Cir. 2009) (quoting *Cash v. Wal-Mart Group Health Plan*,

107 F.3d 637, 641 (8th Cir. 1997), with internal quotation marks omitted).

### 3.     *Arguments of the parties*

Settell argues that her treating physicians and even the consulting physician that

MetLife had review her file the first time, in relation to her application for STD benefits,

all agreed that Settell's health conditions prevented her from performing her own job at

FDAH.  She points out that, notwithstanding those opinions, MetLife determined that she

was not entitled to LTD benefits, even though the definition for "total disability" for the

first 24 months of LTD benefits, after the six-month waiting period covered by STD

benefits, is exactly the same as the definition for STD benefits. She also argues that her pertinent health problems are not just breathing problems, but also orthopedic and arthritic difficulties. She argues that, although Dr. Porter, the second physician to perform a consultant's review of her file for MetLife, opined that she could perform some type of full-time work, the restrictions that he imposed were still not compatible with the requirements of her job at FDAH. Thus, she argues that, in light of overwhelming medical evidence in her favor and the absolute lack of medical evidence supporting MetLife's denial, it was simply unreasonable for MetLife to deny her LTD benefits claim.

MetLife argues, to the contrary, that there was substantial evidence to support denial of Settell's LTD benefits claim. More specifically, MetLife asserts that Settell asks the court to answer the wrong question: In MetLife's view, the question is not whether MetLife had medical opinions that demonstrated that Settell could or could not return to work, but whether there is a reasonable explanation for MetLife's decision to deny benefits based upon information that Settell submitted or that MetLife obtained, and hence, whether MetLife's decision was arbitrary, capricious, and unsupported by any evidence in MetLife's possession. Here, MetLife argues that there is substantial evidence to support its decision, in the form of Dr. Porter's determination that the information available was insufficient to support any impairment that would have prevented Settell from performing any gainful work. Specifically, MetLife points to Dr. Porter's conclusion that there was insufficient information to support the alleged severity of reactive airway disease or allergic rhinitis as sufficient to limit Settell's ability to engage in full-time work, and that there was insufficient evidence of other impairments severe enough to prevent her from performing work. MetLife argues that, while reasonable minds could differ, the denial of benefits here clearly was not an abuse of discretion under the proper standard of review.

In reply, Settell argues that the only physician on whom MetLife relied was Dr. Porter, but Dr. Porter was never asked whether Settell could return to her own occupation, and even the restrictions that Dr. Porter would have imposed would have precluded her from pursuing her own occupation. In contrast, Settell points out that the Administrative Record contains opinions of six other physicians that she could not perform her own occupation.

### 4.    Analysis

The court rarely characterizes a determination as "easy," but this one is. It is abundantly clear that MetLife never considered the proper definition of "total disability" for the first 24 months of LTD benefits in denying Settell's claim. Again, that definition is whether Settell was unable "to perform the duties of [her] occupation." Administrative Record at 218. Rather, MetLife used *only* the second-tier definition of "total disability," applicable after the first 30 months of disability, to Settell's claim, which related to her ability "to engage in any substantial gainful employment for which [she was] reasonably fitted by education, training or experience." Administrative Record at 218. Plainly, where Metlife used the wrong definition of "total disability," its decision was not supported by a reasonable explanation, and its interpretation of the record is not reasonable, but an abuse of discretion. *Midgett*, 561 F.3d at 897 ("Provided the decision 'is supported by a reasonable explanation, it should not be disturbed, even though a different reasonable interpretation could have been made,'" quoting *Schatz*, 220 F.3d at 949, in turn quoting *Cash*, 107 F.3d at 641).

The problem is immediately apparent in Dr. Porter's consultant review, because the question he purported to answer is, "Does the medical information on file supports [sic] the functional limitations and the claimant's inability to function at any gainful occupation?" Administrative Record at 196. That question essentially tracks the definition

24

of "total disability" applicable *after* the first 30 months of disability, which is whether the claimant is unable "to engage in any substantial gainful employment for which [the claimant is] reasonably fitted by education, training or experience." Administrative Record at 218. While Dr. Porter's negative answer and explanation for it may constitute substantial evidence—that is, more than a scintilla of evidence—that Settell was not disabled under the second tier of the LTD plan's definition of "total disability," applicable after 30 months of disability, his answer and explanation do not even remotely address Settell's ability to perform "[her] occupation," the definition applicable for the first 24 months that LTD benefits are available. *Midgett*, 561 F.3d at 897 (to determine whether a plan administrator's decision was arbitrary and capricious, "we ask whether the decision to deny . . . benefits was supported by substantial evidence, meaning more than a scintilla but less than a preponderance") (internal quotation marks and citations omitted).

Moreover, based on the restrictions on Settell caused by her health conditions that Dr. Porter found *were* supported by the record, no reasonable person *could* have found that Settell could have performed "[her] occupation." *Id.* (whether an administrator's decision was reasonable depends upon whether a reasonable person *could* have reached a similar decision, not whether a reasonable person *would* have reached that decision). Dr. Porter recognized that Settell could only perform "light work" (although one of his references is to "like work") involving lifting 20 pounds maximum and ten pounds on a repeated basis, and limitations on standing and walking to one hour at a time for not more than four hours in a day—at least the court construes Dr. Porter's references to "looking" 20 pounds maximum to be "lifting" 20 pounds maximum, because nothing in the record suggests that psychokinesis is a required ability for a processing engineer at FDAH, and there is no other evidence in the record that Settell possessed such an ability. Administrative Record at 196. FDAH's description of "occupational requirements" for

Settell's job as a processing engineer included requirements that she be able to carry and lift up to 30 pounds, not 20 pounds maximum. Administrative Record at 277-79; *see also* Administrative Record at 281 (explanation of duties for Settell's processing engineer position as requiring "the ability to . . . perform heavy lifting. . . ."). Similarly, Dr. Porter's standing and walking restrictions also appear to conflict with the "occupational requirements" that Settell be able to stand 45% of the working day and walk 25% of the working day. Administrative Record at 277-79.

The court is also not convinced that any reasonable person reviewing this record *could* have reached Dr. Porter's conclusion that "there is no strong association provided to work environments" for her breathing problems. Administrative Record at 196. The record is replete with medical conclusions that Settell's breathing problems were aggravated by exposure to her workplace and that her condition invariably improved when she stayed away from the workplace. Thus, even if one accepted Dr. Porter's conclusion that the record did not support the specific diagnosis of restrictive airway disease or allergic rhinitis, based on this record, no reasonable person *could* conclude that Settell did *not* suffer breathing problems when exposed to her work environment as a processing engineer at FDAH. *Midgett*, 561 F.3d at 897 (whether an administrator's decision was reasonable depends upon whether a reasonable person *could* have reached a similar decision, not whether a reasonable person *would* have reached that decision). In contrast, MetLife's other physician consultant, Dr. Menotti, reached precisely the conclusions that Settell "clearly has an occupational health issue with her current work site and would therefore be considered medically unable to perform the essential duties of her own occupation at that workplace from the time period in question of 06/22/01 through to the current date," and that "the medical evidence is clear and supports the notion that the claimant would be medically unable at this point in time to perform the essential duties of

her own occupation as a result of her environmental exposures at the workplace." Administrative Record at 61-62.

Indeed, MetLife does not argue anywhere in its brief that there was any record evidence that would support a conclusion that Settell could perform *her own occupation* at FDAH. MetLife's entire briefing on this issue is devoted to attempting to show that Dr. Porter's opinion supports the conclusion that Settell could perform *some* full-time work. MetLife simply poses the wrong question, or at least poses the wrong question first, and never reaches the right first question, which is whether Settell could perform her *own* job during the first 24 months of purported long-term disability. Although MetLife's final decision on Settell's appeal of denial of her LTD benefits claim makes one reference to Settell's ability "to perform her own occupation," almost all of the references in that denial are to Settell's ability to perform "gainful" or "full-time" work generally. Administrative Record at 55-56. To the extent that the final denial does refer to Settell's ability to perform her own job, however, it cites nothing but Dr. Porter's report in support of that conclusion, and, as explained above, no reasonable person could conclude that Dr. Porter's report indicates that Settell could perform her own job.

Settell is entitled to 24 months of LTD benefits from the end of her STD benefits on December 16, 2001, and MetLife's decision to the contrary is not supported by even a scintilla of evidence, and is, therefore, arbitrary, capricious, and an abuse of discretion. *Midgett*, 561 F.3d at 897. On the other hand, to the extent that Settell claims that she is entitled to LTD benefits after the first 30 months of disability—a claim that the court doubts she makes anywhere in her briefing—there is substantial evidence, meaning more than a scintilla of evidence, in the form of Dr. Porter's report, supporting MetLife's denial of such a claim. *Id.* Settell is entitled to judgment in the amount of LTD benefits for 24 months beginning December 16, 2001.

## B. Failure To Provide Plan Documents

Settell's second claim is that MetLife should be subjected to the maximum penalty under ERISA, pursuant to 29 U.S.C. § 1132(c), for failing to produce plan documents in response to her numerous requests. MetLife also denies that Settell is entitled to any relief on this claim, because MetLife is not the entity subject to any such penalties.

### 1. Authority for a penalty

In addition to authorizing an action challenging a denial of benefits, ERISA permits the court to impose a penalty for failure to provide plan documents, as follows:

> **(c)** Administrator's refusal to supply requested information; penalty for failure to provide annual report in complete form
>
> **(1)** Any administrator (A) who fails to meet the requirements of paragraph (1) or (4) of section 1166 of this title, section 1021(e)(1) of this title or section 1021(f), or section 1025(a) of this title with respect to a participant or beneficiary, or *(B) who fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator) by mailing the material requested to the last known address of the requesting participant or beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day* from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper. For purposes of this paragraph, each violation described in subparagraph (A) with respect to any single participant, and each violation described in subparagraph (B) with respect to any single participant or beneficiary, shall be treated as a separate violation.

29 U.S.C. § 1132(c)(1)(B) (emphasis added).[9] ERISA also expressly provides that an administrator must comply with a written request for plan documents, as follows:

> **(b)** Publication of summary plan description and annual report to participants and beneficiaries of plan
>
> Publication of the summary plan descriptions and annual reports shall be made to participants and beneficiaries of the particular plan as follows:
>
> * * *
>
> **(4)** The administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated. The administrator may make a reasonable charge to cover the cost of furnishing such complete copies. The Secretary may by regulation prescribe the maximum amount which will constitute a reasonable charge under the preceding sentence.

29 U.S.C. § 1024(b)(4) (footnote omitted). Thus, a failure to comply with § 1024(b)(4) would trigger penalties pursuant to § 1132(c)(1)(B).

The penalty provision in § 1132(c) is apparently intended to prevent a claimant from being forced to invest time, effort, and money in hiring an attorney to attempt to gain access to information to which the claimant is legally entitled. *See, e.g.*, *Brown v. Aventis*

---

[9]The daily penalty has been increased at least once, to $110, by Department of Labor regulations. *See Christensen v. Qwest Pension Plan*, 462 F.3d 913, 919 & n.3 (8th Cir. 2006) (citing Final Rule Relating To Adjustment of Civil Monetary Penalties, 68 Fed. Reg. 2875-76 (Jan. 22, 2003). The parties have not cited any subsequent adjustment.

*Pharm., Inc.*, 341 F.3d 822, 825 (8th Cir. 2003). Whether or not to award a penalty is reviewed for abuse of discretion. *Id.*

To recover on a claim for a § 1132(c) penalty, the claimant must prove (1) that he or she requested the plan description in writing and (2) that the plan administrator failed to provide it. *Kerr v. Charles F. Vatterott & Co.*, 184 F.3d 938, 948 (8th Cir. 1999). As the Eighth Circuit Court of Appeals has explained,

> Although an "employer's good faith and the absence of harm are relevant in deciding whether to award a statutory penalty," *Chesnut v. Montgomery*, 307 F.3d 698, 704 (8th Cir. 2002), "neither [a defendant's] good faith nor the absence of actual injury to [the plaintiff] precludes the award of a statutory penalty." *Id.* at 703.

*Brown*, 341 F.3d at 825. On the other hand, "ERISA specifically makes the Plan Administrator responsible for providing the Plan documents," so that an insurer that is not the plan administrator is not subject to this penalty provision. *Ross v. Rail Car Am. Group Disability Income Plan*, 285 F.3d 735, 743-44 (8th Cir. 2002).

### 2. *Arguments of the parties*

In her opening brief, Settell asserts that her November 15, 2001, request for "documentation to support your denial or refusal to pay benefits" was a sufficiently "substantive" request for plan documents to require MetLife to provide the plan documents and SPD. She also argues that her second request, on April 4, 2003, which specifically requested the "applicable long term disability policy" and the "Summary Plan Description," Administrative Record at 72, and her July 22, 2004, request for "[a] copy of the applicable disability Plan" and "[a] copy of the Summary Plan Description," Administrative Record at 260, plainly sufficed to trigger MetLife's duty to provide the plan documents. She argues that MeLife delayed seven years after her initial request before

providing the requested plan documents as part of the Administrative Record in September 2007. Under these circumstances, she argues that she is entitled to the full statutory penalty for MetLife's failure to provide the documents.

MetLife responds that, as the Eighth Circuit Court of Appeals made clear in *Ross v. Rail Car Am. Group Disability Income Plan*, 285 F.3d 735, 743-44 (8th Cir. 2002), no statutory penalty can be imposed upon an insurer that is not the plan administrator. Here, MetLife argues that the SPD makes clear that the "plan administrator" is the Retirement Committee of American Home Products Corporation, citing Administrative Record at 238, and that MetLife was, at most, an insurer and claim administrator, citing Administrative Record at 233-34. Moreover, MetLife argues that, even if it was the plan administrator, it responded in good faith to Settell's request for plan documents by referring her to her employer.

In reply, Settell argues that, even if MetLife was not the plan administrator, it should still be liable under § 1132(c)(1)(B)'s penalty provision, because she had no way to identify the plan administrator without the requested plan documents. Under the circumstances presented here, she argues that civil penalties should be imposed on MetLife. Settell admits that MetLife directed her to her employer for the plan documents, but she argues that there is no indication that either referral was productive for Settell and nothing in either of MetLife's referrals to the employer for copies of the plan documents disclosed to her that MetLife was *not* the plan administrator. Settell argues that MetLife should not be able to hide behind the fact that it was not the plan administrator to escape penalties, when she was not able to identify the plan administrator. She argues that allowing MetLife to escape penalties would encourage the type of conduct that the penalty provision was designed to avoid.

### 3.    Analysis

Again, the court finds this issue to be an easy one.  Settell's claim for § 1132(c) penalties against MetLife is expressly foreclosed by the decision of Eighth Circuit Court of Appeals in *Ross v. Rail Car Am. Group Disability Income Plan*, 285 F.3d 735, 743-44 (8th Cir. 2002).  In *Ross*, the claimant sought a penalty pursuant to § 1132(c)(1)(B) against Canada Life for its alleged failure to provide him with plan documents.  *Ross*, 285 F.3d at 743.  The court rejected the claim for penalties, as follows:

> Section 502(c) of ERISA allows the district court to impose a discretionary $100 per day fine on a plan administrator who fails to provide copies of certain plan documents to participants and beneficiaries.  The district court entered summary judgment on counts three and four because it determined that Canada Life is not the Plan Administrator. Ross argues that this is in error because the Summary Plan Description is inherently ambiguous as to the identity of the Administrator, and because Canada Life served as claims administrator and was the repository of the Plan documents and thus should be held to be the de facto Plan Administrator.
>
> Ross's arguments cannot stand in the face of the uncontroverted facts, ERISA, and settled case law.  The Summary Plan Description unambiguously identifies Rail Car as the Plan Administrator.  Canada Life admits that it had control over claims under the policy, but assuming that function did not transform it into the Plan Administrator. ERISA specifically makes the Plan Administrator responsible for providing the Plan documents Ross requested, *see* 29 U.S.C. § 1024(b), and the Summary Plan Description directed that all requests for Plan documents be made in writing to the Plan Administrator.

*Ross*, 285 F.3d at 743-44.  The court also rejected as "neither consistent, comprehensible, or persuasive" the claimant's arguments that Canada Life was the plan administrator *and*

that Canada Life should not have sent him the documents that it did, because that gave him the impression that Canada Life was the plan administrator. *Id.* at 744.

Here, the SPD plainly identifies the Retirement Committee of American Home Products Corporation as the "Plan Administrator." Administrative Record at 238; *compare Ross*, 285 F.3d at 743-44. The fact that MetLife served as claims administrator does not make it the *de facto* "plan administrator." *Ross*, 285 F.3d at 743-44. It would be just as inconsistent, incomprehensible, and unpersuasive as in *Ross*, 285 F.3d at 744, to hold that MetLife was subject to § 1132(c)(1)(B) penalties when it was not the "plan administrator," because it responded to other aspects of Settell's claim for disability benefits, on the ground that Settell was thereby somehow misled into believing that MetLife was the "plan administrator." Indeed, Settell's arguments that she had no way to identify the plan administrator without the requested plan documents is inconsistent with her admission that MetLife twice referred her request for plan documents to her employer, even if MetLife did not indicate that the employer was the "plan administrator," because if Settell could have obtained the plan documents from another source, she could have determined from those documents who the plan administrator was. Thus, Settell has no one but herself to blame if she did not address her requests for plan documents to the correct entity, her employer, as indicated in MetLife's responses to her requests for plan documents. Similarly, if she did direct her requests for plan documents to the correct entity, her employer, and did not receive the documents, any investment of time, effort, and money in hiring an attorney to attempt to gain access to information to which she was legally entitled, *see Brown*, 341 F.3d at 825 (identifying the purpose of the penalty to be to prevent claimants from having to invest time, effort, and money in hiring an attorney to obtain information to which they are legally entitled), should properly be laid upon the employer, in the form of a § 1132(c) penalty, not upon MetLife as a proxy.

Under the circumstances presented here, Settell's request for imposition of a penalty against MetLife pursuant to § 1132(c)(1)(B) for failure to provide plan documents will be denied, as the request for a penalty is directed at the wrong party.

### III.  CONCLUSION

Upon the foregoing,

1.     Settell is entitled to judgment, pursuant to 29 U.S.C. § 1132(a)(1)(B), in the amount of LTD benefits for 24 months beginning December 16, 2001;

2.     Settell is not entitled to any civil penalty against MetLife, pursuant to 29 U.S.C. § 1132(c), for failure to provide plan documents, as MetLife was not the party responsible for responding to such a request.

Judgment shall enter accordingly.

**IT IS SO ORDERED.**

**DATED** this 14th day of July, 2009.

MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA